No. 96,175

STATE OF KANSAS, *Appellee*, v. PATRICK ANGELO, *Appellant*.

(197 P.3d 337)

Opinion filed December 5, 2008.

*Michael J. Bartee,* of Michael J. Bartee, P.A., argued the cause and was on the brief for appellant.

*John J. Bryant,* assistant district attorney, argued the cause, and *Jerome A. Gorman,* district attorney, and *Paul J. Morrison,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: After a jury trial, Patrick Angelo, Jr., was convicted of two counts of first-degree murder and sentenced to consecutive hard 25 terms. He directly appeals his convictions. Our jurisdiction is under K.S.A. 22-3601(b)(1), convictions of an off-grid crime.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Was Angelo's right to a speedy trial violated? No.

2. Did the State's use of peremptory challenges violate the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)? No.

3. Did the trial court commit reversible error in failing to instruct on the lesser included offense of second-degree murder? No.

4. Did the trial court commit reversible error in finding that Angelo introduced evidence of his good character? No.

5. Did the trial court err in failing to grant a mistrial? No.

6. Did the trial court commit reversible error in allowing the State to play the recorded statement of a witness after she had been excused? No.

7. Did cumulative error deprive Angelo of his right to a fair trial? No.

Accordingly, we affirm Angelo's convictions.

## FACTS

Michael Hampton owned a house on Haskell Avenue in Kansas City, Kansas. Hampton made an agreement with the defendant's son, Patrick Angelo, III (Little Pat), and friends that they could rent the house for several months to help remove it from foreclosure. Little Pat and friends planned to gamble and have "some girls" there. Hampton later learned that some of these people, a group he referred to as the "Thundercats," were buying and selling drugs out of the house.

Hampton had moved out but was again living in the Haskell house in February 2004. Little Pat, Curtis Brooks, Kevin Brown (Geechie), and a drug-addict friend of Hampton, a woman named Jamie Wilson, also stayed there.

On February 18, 2004, police officers raided the house. They seized drugs, guns, and money and arrested several people, including Hampton.

Two nights later, police were called to the house on the report of a double homicide. They found Geechie had been shot twice on the left side of his head, with one hole a "contact gunshot wound," and Wilson had a single contact gunshot wound to the back of her head.

Two days later the defendant, Patrick Angelo, Jr., also known as "Big Pat," was charged by information. Because he was discovered to be in Missouri custody, he was not brought back to Kansas until June 2004.

Hampton testified at the 2005 murder trial that Angelo and Geechie "got along with each other" and had even talked about getting a place together. But, some time before the murders, Angelo told Hampton that he was missing a ring and that Geechie was the "last person that he gave the ring to." According to Hampton, Angelo was "pretty concerned about the ring. He didn't—he didn't show any intent or that he was angry or that he was sad about it, but he was like he wanted the ring."

According to Hampton, a few weeks before the murders he had been in an altercation with Angelo because of a misunderstanding over Angelo's girlfriend, Christine Johnson. She told Angelo that "Arkansas" had tried to get her to come downstairs and have sex. Because Hampton was known as Arkansas, Angelo then attacked him, striking Hampton in the head with his pistol butt. Hampton denied Johnson's allegations.

Hampton testified that a day or two after this attack, Angelo brought Johnson to the house. She told Angelo that she had confused the names and that Geechie—not Hampton—was the man who had wanted sex. Angelo then apologized to Hampton and gave him some drugs.

Geechie's friend and housemate, Curtis Brooks, testified that at approximately 8 or 9 on the night of the murders, Angelo and Little Pat knocked on the house's front door. They were both upset. Once inside, Angelo walked to the air vent and pulled something out. Brooks believed it was a gun. Angelo then asked where Geechie was, and Brooks told him "in the basement." As Angelo instructed, Brooks told Geechie to go into the bathroom because Angelo wanted to yell at him. Geechie complied.

According to Brooks, he was afraid Little Pat had come after him for money owed. Brooks therefore asked another person there to take him to the house of his nephew, Horace. When Brooks left the house, Angelo and Little Pat were in the bathroom with Geechie, and Wilson was in the room next to the bathroom.

When Brooks arrived at Horace's house, he asked for a gun because "something's going to happen." Horace advised Brooks to tell Little Pat that Horace would cover Brooks for the money owed, so Brooks returned to the Haskell house without a gun. Ten minutes after he had initially left the Haskell house, he discovered the bodies of Geechie and Wilson.

Maurice Williams, Jr., testified that he was among those who had been arrested during the February 18 house raid. On the night of his release from custody, February 20, Little Pat picked him up from the jail. They then went to a basketball game and to Little Pat's grandmother's house to meet Angelo. Little Pat and Angelo wanted to go to the Haskell house so Little Pat could retrieve some money he had hidden there.

According to Williams, Angelo drove them to the street behind the Haskell house. Williams did not enter because he had been arrested there just 2 days earlier. Angelo and Little Pat both entered the house and came running back to the car 10 to 15 minutes later. Angelo said Geechie was dead.

Williams further testified that he and Little Pat hung out for the rest of the night. When Williams asked Little Pat what happened, Little Pat said there was no arguing but he heard gunshots and saw Geechie fall onto Angelo. Little Pat then ran out of the house. Later that night, Williams heard Little Pat tell Angelo on the telephone that he was not going to jail "for nothing he didn't do." Like Hampton, he was somewhat aware that Angelo and Geechie "was kind of into it about some girl and the ring."

Little Pat's testimony was mostly consistent with Williams'. He confirmed that he picked up Williams from jail, they went to the grandmother's house, and then they went to a basketball game. Angelo called Little Pat wanting to go to the Haskell house. Little Pat thought he had some money at the house and that Williams had left some keys there.

According to Little Pat, Angelo drove to the street behind the house and Brooks let the father and son inside. Little Pat went upstairs to look for the money and keys. When he came downstairs, he heard a "little loud noise" and saw Geechie hunched over, leaning on Angelo, so he ran out the door. When outside, he heard another loud noise. He and Angelo were in the house for about 10 or 15 minutes.

The first trial ended in a hung jury. During the retrial on November 14-18, 2005, the jury convicted Angelo of two counts of first-degree murder. He was sentenced to consecutive hard 25 terms.

More facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *Angelo's right to a speedy trial was not violated.*

Angelo first argues his right to a speedy trial was violated when his trial was not commenced within 90 days of his arraignment as required by K.S.A. 22-3402. The State acknowledges this right. It argues, however, that Angelo's situation is controlled by the interstate Agreement on Detainers (Agreement), K.S.A. 22-4401 *et seq.*, and his trial was commenced within the extra time granted by that Agreement. There is no dispute that Angelo's trial began more than 90 days after his arraignment but within the extended time under K.S.A. 22-4401.

Whether K.S.A. 22-4401 applies is a question of law subject to unlimited review. *State v. Hargrove*, 273 Kan. 314, 319, 45 P.3d 376, *cert denied* 537 U.S. 982 (2002).

We begin by examining the speedy trial statute, K.S.A. 22-3402, which provides in relevant part:

"(1) If any person *charged with a crime and held in jail solely by reason thereof* shall not be brought to trial within 90 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant, or a continuance shall be ordered by the court under subsection (5)." (Emphasis added.)

Based upon the italicized language, the State argues that K.S.A. 22-3402 does not apply because Angelo was not in its custody

"solely" on the murder charges. Rather, he was in a Missouri prison because of criminal charges arising in that jurisdiction when he was transferred to the Wyandotte County jail in June 2004 to face that county's murder charges. Based upon the plain language of the statute, we agree with the State. See *State v. Sanders*, 224 Kan. 138, 140, 578 P.2d 702 (1978) ("The first subparagraph of the act is designed to provide trial within 90 days for persons held in custody only because of the pending charge."); see also *Steffes v. City of Lawrence*, 284 Kan. 380, Syl. ¶ 2, 160 P.3d 843 (2007) (When a statute's language is plain and unambiguous, there is no need to resort to statutory construction. An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there.).

As additional support for our holding, we examine the Agreement on Detainers and analogous case law. K.S.A. 22-4401, Article III, states:

"(a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, *he shall be brought to trial within one hundred and eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint:* Provided, that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance." (Emphasis added.)

This court has previously spoken to the interplay between the general speedy trial statutes and the detainers statutes. In *State v. Dolack*, 216 Kan. 622, Syl. ¶ 4, 533 P.2d 1282 (1975), the court rejected defendant's claim that he had not been brought to trial within the prescribed 180 days under the Agreement on Detainers, K.S.A. 22-4401. In so holding, we noted:

"The right of an inmate to a speedy trial who is confined in a penal or correctional institution in this state, or confined in a penal or correctional institution in another state, is *governed solely by the detainer statutes*—in the first instance, by the Uniform Mandatory Disposition of Detainers Act (K.S.A. 22-4301 *et seq.*),

and in the second instance, by the Agreement on Detainers (K.S.A. 22-4401 *et seq.*). (The second instance includes an inmate who is confined in the United States Penitentiary at Leavenworth, Kansas.)" (Emphasis added.) *Dolack*, 216 Kan. 622, Syl. ¶ 4.

We have also previously discussed in some detail the application of the Uniform Mandatory Disposition of Detainers Act, K.S.A. 22-4301 *et seq.*—where a prosecution is pending against an in-state inmate accused of another offense—in the speedy trial context. In *Townsend v. State*, 215 Kan. 485, 524 P.2d 758 (1974), an inmate of the Kansas penitentiary was convicted in Leavenworth District Court for assaulting a guard. He argued that the State had failed to comply with that part of K.S.A. 62-2901 (Corrick) (now K.S.A. 22-4301) which provides that if his request for speedy trial is properly served and filed, he must be brought to trial within 180 days of the request. In rejecting his argument, among other things this court explained:

"At the time of appellant's trial the general legislative definition of a speedy trial was found in K.S.A. 62-1431 and 62-1432, providing for trial within two or three terms of court, depending on whether the accused was in jail or free on bond. Those statutes were repealed in 1970 by what is now K.S.A. 1973 Supp. 22-3402. [Citation omitted.] So long as the statutory deadlines are met, an accused is not heard to claim a denial of a speedy trial. [Citations omitted.]

"As to inmates of a penal institution, however, those statutes are inapplicable. *Inmates' rights are governed solely by the detainers act.* [Citations omitted.] In *State v. Brooks*, [206 Kan. 418, 479 P.2d 893 (1971)], we held:

'Where a prosecution is pending against an accused confined in a state penal institution for another offense, *the definition of a speedy trial* and the procedure for relief are governed by the provisions of the Uniform Mandatory Disposition of Detainers Act, K.S.A. 62-2901 *et seq.*, and the provisions of K.S.A. 62-1431 have no application.' (Syl. ¶ 1.)

. . . .

". . . He had a constitutional right to a speedy trial, but that right was defined in the detainer's act. He concedes as much." (Emphasis added.) *Townsend*, 215 Kan. at 487-88.

While the *Townsend* court was discussing the detainers act dealing with in-state inmates, its reasoning extends to the detainers act dealing with out-of-state inmates. See *Dolack*, 216 Kan. at 633 (fact the Uniform Mandatory Disposition of Detainers Act rather than Article III[a] of the Agreement on Detainers were used inter-

changeably by the trial court is immaterial since the rights of inmates to a speedy trial are governed solely by the detainers statutes). Both detainers acts establish speedy trial deadlines for inmates separate from the one contained in K.S.A. 22-3402, which is simply inapplicable to Angelo under these circumstances.

Issue 2: *The State's use of peremptory challenges did not violate the Equal Protection Clause and Batson v. Kentucky.*

Angelo, an African-American, next contends the State's striking of prospective jurors 8, 31, and 38—also African-Americans—violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as analyzed in *Batson v. Kentucky*, 476 U.S. 79. Specifically, he alleges that the trial court failed to perform the third step in the *Batson* analysis: determining whether the defendant "carried his burden of proving purposeful discrimination." See *State v. Pham*, 281 Kan. 1227, Syl. ¶¶ 3, 6, 136 P.3d 919 (2006). As a result, he asks for remand. The State admits that the trial court did not express its holding in this exact language but essentially argues that the determination is implicit in the court's performance of the first two steps and in its ultimate rejection of Angelo's *Batson* challenge.

Our analysis begins with an examination of the standard of review for *Batson* challenges as stated by this court in *Pham*, 281 Kan. 1227:

"When we review a challenge under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), concerning the State's use of a peremptory challenge, we ask whether the trial court abused its discretion in determining if the challenged strikes were constitutionally permissible. [Citation omitted.] Discretion is abused only when no reasonable person would take the view adopted by the trial court. The defendant bears the burden of establishing such an abuse of discretion. [Citation omitted.]" *Pham*, 281 Kan. at 1236.

" 'The *Batson* analysis involves a three-step process. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. In this second step, the prosecutor is only required to put forth a facially valid reason for exercising a peremptory strike . . . . *Finally, the trial court must determine whether the defendant has carried his or her burden of proving purposeful discrimination.*' (Emphasis added.)

"The standard of review of the first step—the prima facie showing on the basis of race—is a question of legal sufficiency subject to plenary review. [Citation omitted.]

"Regarding the second step—the prosecutor's burden to show a race-neutral explanation for striking the jurors in question—it does not demand a prosecutor's explanation that is persuasive, or even plausible, but merely facially valid. [Citation omitted.] Further, unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Accordingly, the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike.* [Citation omitted.]" (Emphasis added.) *Pham*, 281 Kan. at 1237.

For the third step, the one at issue in the instant case, we stated:

"Finally, the standard of review of the third step—the trial court's decision on the ultimate question of whether the defendant has carried the burden of proving purposeful discrimination—is greatly deferential because the determination is factual. [Citation omitted.]

" ' "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because, as we noted in *Batson*, the finding will 'largely turn on evaluation of credibility.' [Citation omitted.] *In the typical peremptory challenge inquiry, the decisive questions will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.* There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge . . . [the evaluation of which] lies 'peculiarly within a trial judge's province.' [Citations omitted.]" ' " (Emphasis added.) *Pham*, 281 Kan. at 1237 (quoting *Hernandez v. New York*, 500 U.S. 352, 364-65, 114 L. Ed. 2d 395, 111 S. Ct. 1859 [1991]).

As the United States Supreme Court has observed, *Batson* requires the judge to assess the plausibility of the State's reason in light of all evidence bearing on it. *Miller-El v. Dretke*, 545 U.S. 231, 252, 162 L. Ed. 2d 196, 125 S. Ct. 2317 (2005).

During voir dire, Angelo's counsel pointed out that the State had struck six black, five white, and one Asian panel members. He then challenged the State's strikes of African-American jurors 8, 31, and 38 because they "just show a pattern of racially motivated strikes."

The court invited the State to respond. The State explained that juror 8 previously had been on a hung jury and juror 16—a white female—was struck for the same reason. The brother of juror 31 had been arrested for distribution of drugs, and the State was striking all jurors with family members who had been arrested. Two

white males indeed had been struck for this reason. Juror 31 was also familiar with the area where the crimes occurred, *i.e.*, a "drug house."

The court invited Angelo's counsel to respond to the State's proffered reasons, which he did at length, denying that they constituted race-neutral grounds for jurors 8 and 31. He did not, however, address the issue of white panel members who had been struck for the same reasons.

After initially stating that "so far I've not detected a pattern of racial[ly motivated] strikes" supporting Angelo's claims, the judge eventually found that the State's given reasons were race-neutral: "Well, the basis for peremptory challenge is you don't have to have a lot of reason to do it as long as it's a race neutral reason. And so far [the prosecutor] has stated race neutral reasons for striking juror number 8 and 31."

The State then turned to juror 38. It noted that he was a 43-year-old housekeeper without a spouse or children. The State explained that "he had a very unfavorable disposition through his body language and facial expressions, frowning when [the prosecutor] was mentioning certain aspects of the case, even though he did not comment."

The court then asked Angelo's counsel if he wished to be heard. His entire response, which did not focus on body language, was as follows:

"I don't think that does it, Judge. I mean again, there's been nothing presented by the way of any comments he's made, anything—and I can't imagine what his occupation or his social—his personal background by the fact that he's single or any of those issues would establish how he could not be a fair and impartial juror and that provides a race neutral reason for striking him."

The court then replied, "The Court is going to find that again that [the prosecutor] has stated a race neutral reason for striking that particular juror [38]." It ascertained from Angelo's counsel that he was not complaining of any more strikes. After a colloquy between the court and all counsel ascertaining the final makeup of the jury—two black, one Hispanic, one white with a Hispanic surname, and eight white—the court ruled, "[Defense counsel], your

*Batson* challenge is noted for the record and it's overruled and we're going to go forward with the people that we have here."

Turning to Angelo's specific complaint that the trial court did not perform the third *Batson* step, we initially observe that per step one, Angelo challenged the State's strikes to jurors 8, 31, and 38. Per step two, the State then responded with its purported race-neutral explanations for the strikes. We acknowledge the record does not reflect a clearly articulated identification of the third step. For example, the court simply stated that it found race-neutral reasons, which could be suggestive of only step two and not step three's determination of whether Angelo had carried his burden of proving purposeful discrimination.

Nevertheless, we hold that the trial court essentially performed its analysis under the third *Batson* step. Specifically, after initially stating that it had not detected a pattern of discrimination, it heard the State's reasons and supporting information for striking the jurors and then asked for, and received, Angelo's responses. It later ruled that the prosecutor had stated race-neutral reasons and ultimately, and specifically, overruled the *Batson* challenge.

One factor a court may consider in the determination of whether a defendant has carried his or her burden of purposeful discrimination is the presence of other members of the same minority on the jury. *State v. Trotter*, 280 Kan. 800, 812, 127 P.3d 972 (2006); *State v. Dean*, 273 Kan. 929, 933, 46 P.3d 1130 (2002). The trial court observed that the panel began with 34 white, 16 black, 4 Hispanic, and 1 Asian members. It also specifically observed that two African-Americans remained on Angelo's jury.

Another factor that may be considered is whether white potential jurors were removed for the same reasons African-Americans were removed. See *Miller-El*, 545 U.S. at 241. Here, the prosecutor pointed out that several white members were removed for the same reasons that black jurors 8 and 31 were. Angelo's counsel never responded to this specific information.

A third factor, particularly regarding juror 38, is a juror's body language. See *Snyder v. Louisiana*, 552 U.S. 472, 170 L. Ed. 2d 175, 181-84, 128 S. Ct. 1203 (2008). This court has upheld peremptory strikes based on counsel's intuition and a juror's body

language. See *Dean*, 273 Kan. at 933; *State v. Hood*, 245 Kan. 367, 375, 780 P.2d 160 (1989). Here, the State proffered that factor as an explanation for striking juror 38. Angelo's counsel also never specifically responded to this reason.

Based upon this record, we conclude that the trial court considered this information and impliedly held Angelo failed to prove that the State's reasons were pretextual and that he therefore failed in his ultimate burden to prove purposeful discrimination.

The case of *United States v. Corley*, 519 F.3d 716 (7th Cir. 2008), is of great guidance on this issue. There, as in the instant case, the defendant argued that the trial court did not follow the three-step *Batson* process. The Seventh Circuit Court of Appeals noted that the government proffered its race-neutral reasons about the stricken juror. And like the instant case:

> "The district court did not *then* explicitly declare that the government had provided a race-neutral reason and that the inquiry would proceed to step three. That is because defense counsel proceeded directly into the argument that the reasons were insufficient. . . . The ensuing discussion was clearly a step three argument, and there is no formalistic requirement that the steps be labeled and explicitly delineated, as long as it is clear from the record that each step was in fact considered. Here, the prosecutor proved facially neutral reasons, and therefore the defense counsel properly progressed to the final step of attempting to prove that the strike was discriminatory. [Citation omitted.] The district court proceeded to hear [defendant's] arguments . . . . *The court then held that the government had provided race-neutral non-discriminatory reasons* . . . ." (Emphasis added.) 519 F.3d at 722-23.

The *Corley* court held that the trial court had accepted the government's argument and the determination was factually supported by the record, and affirmed the rejection of the *Batson* challenge. 519 F.3d at 723.

Similarly, in *Messiah v. Duncan*, 435 F.3d 186, 198-200 (2d Cir. 2006), the Second Circuit Court of Appeals affirmed the trial court's rejection of a *Batson* challenge, although the lower court did not label or explicitly delineate the steps of its analysis. After the prosecutor proffered a race-neutral explanation for striking juror Woodbury, a short colloquy ensued between defense counsel and the court. The trial court then asked him, "Anything else you wish to add?" After reciting the trial court's clarification to counsel

of anything more regarding the State's five strikes, the Second Circuit then held:

"The trial judge listened to the arguments, asked defense counsel if he had anything more to contribute and then *unequivocally stated on the record his acceptance of all five of the prosecutor's strikes, including that of Woodbury.* It is evident that the trial judge did not discredit or find unpersuasive the prosecutor's race-neutral explanations for striking Woodbury. *Clear acceptance of that strike following the Batson challenge, the proffered race-neutral explanation, and the ensuing discussion was a succinct but adequate Batson ruling.*" (Emphasis added.) 435 F.3d at 199.

The *Messiah* court summarized: "As long as a trial judge affords the parties a reasonable opportunity to make their respective records, he may express his *Batson* ruling on the credibility of a proffered race-neutral explanation in the form of a clear rejection or acceptance of a *Batson* challenge. [Citation omitted.]" 435 F.3d at 198. In so doing, the Second Circuit specifically rejected the concept that "a trial judge is obligated to provide 'a talismanic recitation of specific words in order to satisfy *Batson.*'" 435 F.3d at 199 n.6.

The case of *People v. Robinson,* 187 P.3d 1166 (Colo. App. 2008), is of particular guidance because its trial court's language was similar to that in the instant case. There the trial judge heard the State's reasons for striking the only African-American from the panel and then rejected defense counsel's *Batson* objection, stating: "*'The Court finds that . . . the DA has stated an articulable non-racial [basis] for his peremptory, which is the standard.* So, the motion for, I guess, reinstating [the panel member] into the jury is denied.'" (Emphasis added.) 187 P.3d at 1171.

The *Robinson* court found that the prosecutor had met his burden under *Batson's* step two of offering a race-neutral explanation for striking the panel member. 187 P.3d at 1173. It then proceeded to the third step of the analysis. As in the instant case, it held that the "district court obviously (albeit implicitly) found the prosecutor's stated reasons credible." 187 P.3d at 1174. The language of the trial court's finding obviously did not label it step three or explicitly delineate it. Nevertheless, the appellate court had no problem in ultimately concluding that the trial court did not err in

denying defendant's *Batson* challenge, *i.e.*, that the defense made no showing of purposeful discrimination. 187 P.3d at 1174.

Even assuming Angelo is correct, *i.e.*, that the trial court in the instant case only completed the second *Batson* step, then it was Angelo, not the trial court, who failed to proceed with the third. That failure is fatal to his claim. In *Davis v. Baltimore Gas and Elec. Co.*, 160 F.3d 1023 (4th Cir. 1998), the defendant proffered his racially neutral reasons, but the record revealed no further comment on the matter. The Fourth Circuit Court of Appeals stated:

"Plaintiff made no attempt to satisfy the third step in the *Batson-Edmonson* scheme. [See *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 114 L. Ed. 2d 600, 111 S. Ct. 2077 (1991).] The burden is on the party alleging discriminatory selection of the venire to prove the existence of purposeful discrimination, see *Batson*, 476 U.S. at 93, 106 S. Ct. 1712, yet when faced with [defendant's] presentation of a seemingly race-neutral explanation, Plaintiff stood mute—effectively abandoning his *Batson-Edmonson* challenge." 160 F.3d at 1027.

The *Davis* court also addressed plaintiff's claim that the trial court made no findings of fact and stated no rationale for its decision that the defendant had properly exercised its peremptory strikes. Here, the same might be said of the trial court's mere statement that the reasons for the strikes were racially neutral. The *Davis* court held, however, that the trial court was not required to make on the record rulings articulating its reasons for overruling a *Batson* objection where the movant fails to pursue the objection after racially neutral reasons are given. "By failing to dispute [defendant's] explanations, Davis appeared to acquiesce in them. As a result, there was no need for the trial judge to make a more precise on-the-record ruling." 160 F.3d at 1028.

The Fourth Circuit stated that it was joining the Eighth and Second Circuits in holding that the plaintiff waived his *Batson* challenge by failing to pursue his objection, *e.g.*, by arguing pretext, once defendant offered a legitimate, nondiscriminatory explanation. 160 F.3d at 1027. See, *e.g.*, *Hopson v. Fredericksen*, 961 F.2d 1374, 1376 (8th Cir. 1992) (plaintiff made no attempt to rebut the defendant's advancement of presumably racially neutral reasons; by failing to pursue *Batson* objection, movant failed to preserve the issue for appeal); *United States v. Rudas*, 905 F.2d 38 (2d Cir.

1990) (because defendant's counsel said nothing in response to the government's explanations for its peremptory challenges, objection has been waived: "Once the [nonmovant] has offered reasons for its peremptory challenges, [the movant] must expressly indicate an intention to pursue the *Batson* claim"); see also *United States v. Arce*, 997 F.2d 1123, 1127 (5th Cir. 1993) (citing *Rudas,* held that by failing to dispute prosecutor's explanation for strike in the trial court, defendants waived their right to object to it on appeal; therefore stood as uncontested basis for excluding them and no resultant need to consider other prosecutor explanation); *cf. United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003) (if defendant fails to rebut a race-neutral explanation at the time it was made, the trial court's ruling on the objection is reviewed for plain error).

In further addressing the assumption that Angelo is correct, *i.e.*, that the trial court only completed the second step, we independently observe that not only did Angelo fail to proceed with the third one, but that he also failed to object at the time to the court's purported incomplete *Batson* analysis. See *State v. Kirtdoll*, 281 Kan. 1138, Syl. ¶ 7, 136 P.3d 417 (2006) (ordinarily an appellate court will not consider an issue which has not been raised in the trial court). Such an objection would have given the trial court an opportunity to clarify or to cure the purported defect.

We agree that the better practice is for the trial court to identify and follow each of the *Batson* steps in its analysis and, in the third step, to clearly articulate something like "the defendant has not carried his burden of proving purposeful discrimination." Nevertheless, we conclude that Angelo has not shown that the trial court failed to follow *Batson* in rejecting his challenge.

Issue 3: *The trial court did not commit reversible error in failing to instruct on the lesser included crime of second-degree murder.*

Angelo next argues the trial court committed reversible error in failing to instruct the jury on the crime of second-degree murder because some evidence exists to justify a conviction of this lesser included offense. See K.S.A. 22-3414(3). The State responds that the failure to so instruct was invited error about which Angelo cannot complain on appeal. See *Kirtdoll*, 281 Kan. 1138, Syl. ¶ 7.

At the instruction conference, defense counsel informed the court that a jury "compromise verdict" of two second-degree murder convictions would essentially equate to a life sentence for Angelo, who was in his 40's. Accordingly, counsel stated that he and Angelo wanted an "all-or-nothing" stance before the jury. Angelo stated on the record that he agreed. The court advised it would be willing to instruct on second-degree murder. However, the court wanted Angelo to understand that if he were convicted of first-degree murder, he would not have grounds for appeal because it was at his specific request that a second-degree instruction was not given. Again on the record, Angelo replied that he understood and acknowledged that he did not wish such an instruction. The court then omitted it.

Angelo contends that trial courts have a nondiscretionary duty to give instructions on lesser included crimes if they are supported by the evidence. He cites K.S.A. 22-3414(3), which states in relevant part:

"In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (2) of K.S.A. 21-3107 and amendments thereto, the judge *shall* instruct the jury as to the crime charged and any such lesser included crime." (Emphasis added.)

Accordingly, Angelo further argues that the trial court should have given the second-degree murder instruction over his objection, citing *State v. Cordray*, 277 Kan. 43, 82 P.3d 503 (2004). He contends that *Cordray* reaffirmed the obligation of the trial court to instruct on lesser included offenses when supported by the evidence, "regardless of the defendant's wishes." See 277 Kan. at 53-55. As a result, Angelo argues, he may appeal the court's failure to instruct on lesser included crimes, and the issue should be analyzed as one in which he simply made no objection to the court's decision not to instruct, *i.e.*, whether the failure was clearly erroneous. See K.S.A. 22-3414(3).

We acknowledge that on *Cordray*'s face the opinion appears to provide some comfort to Angelo. There, Cordray argued that the trial court's instructing on lesser included offenses over his objection denied him of a fair trial by precluding an all-or-nothing de-

fense. This court rejected Cordray's argument, holding that a criminal defendant does not have a right to an all-or-nothing defense. 277 Kan. at 55. We further held that trial courts have a duty to instruct on all lesser included offenses reasonably justified by the evidence presented at trial. 277 Kan. at 53.

Here, the trial court determined that a second-degree murder instruction was justified based upon the facts presented at trial. Therefore, under *Cordray*, the court erred in failing to give that instruction.

However, in *Cordray*, the trial court gave the required instructions over defendant's objection. By contrast, here the trial court acceded to Angelo's request and did not give it. In short, Angelo invited this error. A litigant may not invite and lead a trial court into error and then complain of the trial court's action on appeal. See *Kirtdoll*, 281 Kan. at 1150-51. There, the defendant championed the use of an eyewitness jury instruction and then claimed on appeal the trial court erred in using it. By the same rationale, because Angelo requested that the instruction not be given, he is barred from claiming the court erred in acceding to his request. Although not critical to our conclusion, we note that a denial of relief is particularly appropriate where Angelo twice told the court personally that he did not want the instruction, even after acknowledging that he could not appeal from the consequences of his decision, *e.g.*, because of invited error.

Issue 4: *The trial court did not commit reversible error in finding that Angelo introduced evidence of his character.*

Angelo next argues the trial court committed reversible error in finding that he had introduced evidence of his own good character and thereby allowed the State to present evidence of his prior convictions under K.S.A. 60-447. He contends the State initially opened the door to his character on direct examination of its own witness. The State responds that the trial court correctly found that Angelo had instead opened the door on cross-examination.

Generally, evidentiary rules governing admission and exclusion of evidence may be applied either as a matter of law or in the exercise of the trial court's discretion, depending on the contours

of the rule in question. When the adequacy of the legal basis of a trial judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo. See *State v. Reid*, 286 Kan. 494, Syl. ¶ 2, 186 P.3d 713 (2008).

On direct examination by the State, Hampton testified about his altercation with Angelo over Angelo's girlfriend, Christine Johnson:

"Q: Did there come a time when you and Big Pat had a disagreement over this female?

"A: *Yeah. There was a time—that was the first time that I ever seen Pat really violent and confrontational with me or with anybody.*

. . . .

"Q: Can you describe the confrontation for the jury?

"A: Yeah. *Like I was saying, that's the first time that Pat had ever got violent or confrontational with me at all, and he wasn't himself to me.* Okay, I was downstairs in Geechie's part of the house and I heard a bunch of the young Thundercats hollering, calling my name, Arkansas. And when I came up and walked through the door, Big Pat just took off on me and start swinging and knocked me down and just kind of, you know, dogged me out, jumped on me. . . . I got up and was leaning up against that window by the mailbox right there on the inside of that house. And he pulled out the butt of his gun and said, I told you about fucking with my girl, Nigga, and hit me on the head with the butt of his gun." (Emphasis added.)

On cross-examination, defense counsel asked several questions about the incident. The following colloquy then occurred:

"Q: You said something on direct examination. The time that Pat, Big Pat, got upset with you about thinking that you were hitting on Christine, *you said it's the first time you've ever seen him get violent, right?*

"A: Yes.

"Q: You would agree that *Pat's a pretty easy-going guy, isn't he?*

"A: Yeah." (Emphasis added.)

The State then sought to introduce evidence of Angelo's prior convictions, arguing that defense counsel had opened the door to Angelo's character by referring to him as a "pretty easy-going guy." Defense counsel responded that he had not opened the door to his client's criminal record.

The trial court found that Angelo's counsel's question, and Hampton's response, constituted evidence of Angelo's good character, which allowed the State to then offer contrary evidence. See K.S.A. 60-447 (if offered by the prosecution to prove guilt, evi-

dence of a trait of an accused's character as tending to prove guilt of the offense charged may be admitted only after the accused has introduced evidence of his or her good character). Specifically, the Wyandotte County District Attorney testified that Angelo had previously been convicted of one count of aggravated battery, one count of battery on a law enforcement officer, and one count of battery. Angelo's wife, Jolynn, testified about a separate aggravated battery conviction in which she was his victim.

Angelo argues the State itself introduced evidence of Angelo's character by failing to object when its own witness, Hampton, testified that the Christine Johnson episode was the first time he had ever seen Angelo violent. Accordingly, Angelo claims the "pretty easy-going guy" question was merely cross-examination development of a subject already addressed on direct, citing *Humphries v. State Highway Commission,* 201 Kan. 544, 547, 442 P.2d 475 (1968). The State responds that on Hampton's direct examination he was merely expressing his observations about Angelo's behavior.

We agree with Angelo. Hampton's direct testimony identifying the Johnson episode as the first time he had ever seen Angelo violent and confrontational is quite similar to defense counsel's follow-up characterization of Angelo on cross-examination as a "pretty easy-going guy." In short, the State opened the door and defense counsel basically commented on it. The State, however, may not open the door for itself. See K.S.A. 60-447.

Having found error, we now examine its magnitude. We expressed our standard of review in *State v. Drayton,* 285 Kan. 689, 702, 175 P.3d 861 (2008):

"Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. *State v. Voyles,* 284 Kan. [239,] 252[, 160 P.3d 794 (2007)]; see K.S.A. 60-261. Among other things, this court specifically considers whether the error is of such a nature as to affect the outcome of the trial. See *State v. Englehardt,* 280 Kan. 113, 130, 119 P.3d 1148 (2005) (reversal is required only where an erroneous admission of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice)."

As a result of the court's erroneous ruling, evidence of Angelo's prior convictions was incorrectly admitted. Nevertheless, Hamp-

ton's testimony on direct examination, which was not objected to, established that Angelo just "took off" on him. Angelo swung, knocked Hampton down and jumped on him. After Hampton got to his feet, Angelo pulled out a gun and struck Hampton in the head with its butt. Angelo's language essentially established that he had promised this treatment if Hampton ever "fucked with" Angelo's girlfriend, Johnson. This admissible episode gave the jury an unmistakable picture of Angelo's violent behavior toward a resident of the Haskell house several weeks before the murder of other residents there. Accordingly, we hold that admitting evidence of prior convictions for other violent behavior did not affect the outcome of Angelo's trial. The error is not reversible.

Issue 5: *The trial court did not err in failing to grant a mistrial.*

Angelo argues that the trial court abused its discretion in refusing to declare a mistrial after his wife erroneously testified that he had been convicted of attempted murder. The State responds that the measures taken by the court were sufficient to correct the mistake.

The Kansas mistrial statute, K.S.A. 22-3423(1), states in relevant part:

"The trial court *may* terminate the trial and order a mistrial at any time that he finds termination is necessary because:

. . . .

"(c) prejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." (Emphasis added.)

As a general rule, a motion for a mistrial is reviewed under an abuse of discretion standard and the party alleging the abuse bears the burden of proving that his or her substantial rights to a fair trial were prejudiced. *State v. White*, 284 Kan. 333, 342, 161 P.3d 208 (2007) (citing *State v. Patton*, 280 Kan. 146, 181, 120 P.3d 760 [2005]). We examined a court's duty to declare a mistrial in *State v. Lewis*, 238 Kan. 94, 97, 708 P.2d 196 (1985):

"It is necessary when justice so requires to declare a mistrial where there is some fundamental failure of the proceeding. When an event of prejudicial mis-

conduct, the damaging effect of which cannot be removed by admonition and instruction, is presented to the jury, the trial judge must declare a mistrial."

As mentioned, Angelo's wife, Jolynn, was called by the State to testify about a prior conviction. When asked what he was convicted of in 1992, she replied, "Assault to me." When the State asked if she knew the name of the charge, she replied, "I guess attempted murder. I don't —."

Unfortunately for the State's case, in 1992 Angelo was not charged with attempted murder; rather, he was charged with and convicted of aggravated battery. Accordingly, defense counsel objected and asked that the answer be stricken and a mistrial granted. In the alternative, he requested jury clarification that Angelo had not been charged with attempted murder. The trial court sustained the objection and advised the jury that Angelo had neither been "charged nor convicted of the crime of attempted murder . . . and you should disregard the last matter." Jolynn then confirmed Angelo had been charged with aggravated battery in that episode.

We first observe that this court has rejected a claim of abuse of discretion for failure to grant a mistrial when a witness offered an unsolicited or nonresponsive answer to a proper question. In *State v. Goodwin*, 223 Kan. 257, 573 P.2d 999 (1977), Goodwin complained because a police officer testified that he found defendant while looking for a car connected with an armed robbery or a possible homicide. Goodwin claimed that the mention of a homicide was so prejudicial as to warrant a mistrial.

The *Goodwin* court noted that unsolicited and unresponsive answers to proper questions are impossible to exclude in advance, so the proper inquiry is the degree of resulting prejudice. 223 Kan. at 260. The court determined the remark was harmless and the trial court did not abuse its discretion in refusing to grant a mistrial. 223 Kan. at 260; see also *State v. Rinck*, 256 Kan. 848, 853-54, 888 P.2d 845 (1995) (no abuse of discretion in denying a request for mistrial where, without solicitation by the State, a witness improperly referred to the defendant's recent release from prison and a limiting instruction was offered but defendant refused the offer).

Because the question was asked, Jolynn's answer cannot truly be said to be unsolicited. But it was inaccurate and surprising to the prosecutor. He informed the court and counsel that he had spoken with her before trial and understood from her responses that she knew the charge against Angelo had been aggravated battery.

More important, we have said that "an admonition to the jury normally cures the prejudice from an improper admission of evidence." *State v. Navarro*, 272 Kan. 573, 582, 35 P.3d 802 (2001). Therefore, where the trial court sustains an objection and admonishes the jury to disregard the objectionable testimony, reversal is not required unless the remarks are so prejudicial as to be incurable. *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 (2004).

Here, the trial court sustained Angelo's objection and admonished the jury to disregard. Accordingly, it is the defendant's burden to prove that he was substantially prejudiced by the remarks, *i.e.*, that the prejudice was incurable. Angelo, however, simply claims that "[j]urors would reasonably wonder if such a conviction actually existed but should not have been brought to their attention, or if the charge was originally filed and was later plea bargained to something else." But the jury easily could have concluded, from Jolynn's admission that she was "guessing," that she simply was mistaken about the name of the charge. Indeed, the jury then heard her testify that Angelo actually had been convicted of aggravated battery. Under these circumstances, we cannot hold that the prejudice was incurable.

Consequently, we hold that Angelo has not met his burden of showing his substantial rights to a fair trial were prejudiced. The trial court did not abuse its discretion in refusing to declare a mistrial.

Issue 6: *The trial court did not commit reversible error in allowing the State to play the recorded statement of a witness after she had been excused.*

Angelo next claims the trial court committed reversible error in allowing the State to play a tape recording of Johnson's statement to law enforcement in which she allegedly stated that Angelo implicated himself in the murder. Specifically, Angelo claims that

because the tape was played only in rebuttal to her testimony, she was prevented from having an opportunity to explain her statements as required by K.S.A. 60-422(b). Because the State repeatedly characterized the statement as Angelo's confession, he claims the error prejudiced his right to a fair trial.

The State responds that Johnson was given an opportunity to explain her statement because she was presented its transcript and allowed to deny that she had made it. It also argues Angelo was not prejudiced by the procedure, *i.e.*, any error was harmless under K.S.A. 60-261. In this vein, the State contends that if anything, it was the State that suffered prejudice by the procedure. We agree the State's case was damaged, not Angelo's. As a result, a detailed factual recitation, as opposed to a thorough legal analysis pursuant to an evidentiary standard of review, is appropriate.

Johnson testified that around the time of the murders Angelo was acting strange. He eventually told her that "some stuff went down at [the house on Haskell]" and that two people had been murdered. When Johnson asked if Angelo had anything to do with the murders, he told her no, but they were "trying to pin it on him."

The State then questioned Johnson about a recorded statement she gave to Detective Michael Vega, in which she allegedly said that Angelo had told her, "You know that dude that I killed, that's the dude that owed me." When the State handed her a transcription to this effect, Johnson repeatedly denied ever making this particular statement.

Detective Vega then testified on rebuttal that Johnson had, in fact, made the statement. When the State sought to introduce the actual recording of the statement as proof, defense counsel objected, arguing that Johnson had been excused and was not present to explain her statements. He also said it would be proper to play the tape while Johnson was on the stand, giving defense counsel an opportunity to cross-examine her on the contents of the tape. The court overruled the objection, finding that "there was plenty of confrontation about the written statement in court."

After playing the tape, the State asked Detective Vega whether the written transcript was the same as the tape he just heard. He

agreed. Angelo's counsel did not suggest that the tape failed to match the transcript.

While the jury was deliberating, the judge told the parties that the court reporter believed the tape provided "the dude that *got* killed" rather than "the dude that *I* killed." (Emphasis added.) The judge stated that he had listened to the tape a couple of times and was "persuaded that the tape does not say 'that dude that *I* killed.'" (Emphasis added.) When he offered to read a statement to the jury about the tape, the State argued that the tape was not clear but that the court could offer to let the jury listen to it.

The court brought back the jury and said:

"Ladies and gentlemen, members of the jury, there may have been a misstatement by the State. It appears that the audiotaped statement of Christine Johnson may have said, quote, 'that dude that got killed,' instead of, quote, 'that dude that I killed'.

"There was no intent to mislead the jury by either party on this regard. If the jury wishes to hear State's Exhibit 45, it may do so in order to make its own determination."

At the jury's request, the tape was played twice.

If anything, the repeated playing of the tape helped, not harmed, Angelo. If it had not been played, the jury could have mistakenly believed, from the transcript and Detective Vega's testimony in reliance upon it, that Angelo had essentially confessed and actually said "that dude that I killed." Accordingly, any purported violation of K.S.A. 60-422(b) was certainly harmless to him, under both K.S.A. 60-261 and the federal rule articulated in *Chapman v. California*, 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967).

Issue 7: *Angelo was not denied a fair trial due to cumulative errors.*

Angelo finally argues that cumulative errors require reversal of his convictions and remand for a new trial. The State responds no error was committed; but if so, any accumulation did not deny Angelo a fair trial.

Cumulative trial errors require reversal when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. *Reid*, 286 Kan. 494, Syl. ¶ 20.

We have concluded that the trial court erred in failing to instruct on second-degree murder, but we have additionally determined that Angelo is barred from benefitting from that error because he and counsel invited it. We have also concluded that the trial court erred in admitting evidence of his prior convictions, but we have additionally determined that the error was harmless in light of other evidence. As there is no other error damaging him, we must reject his contention.

Affirmed.