NOT DESIGNATED FOR PUBLICATION

No. 112,845

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYRELL JACKSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL GROSKO, judge. Opinion filed October 21, 2016. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Alan T. Fogleman*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., POWELL, J., and STUTZMAN, S.J.

*Per Curiam*:  Tyrell Jackson appeals his conviction by a jury of aggravated robbery alleging seven points of error: (1) The State violated his rights to a speedy trial; (2) the State committed a *Batson* violation; (3) the district court erred in limiting his direct and cross-examination of witnesses; (4) the district court erred in admitting evidence of prior bad acts under K.S.A. 2015 Supp. 60-455; (5) the district court erred in failing to give a limiting instruction to the jury after it admitted evidence of prior bad acts; (6) the district court erred by not instructing the jury on the lesser included offense

1

of robbery; and (7) cumulative errors denied him a fair trial. Finding no errors, we affirm his conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On the night of May 12, 2012, Dorsey was at his cousin's apartment in Kansas City, Kansas, while his vehicle, a 1986 Chevy Caprice, was parked outside the complex. While in the apartment, Dorsey noticed a Tahoe parked in front of his car and four people outside of the Tahoe. Dorsey testified he did not know any of the people outside of the vehicles.

Dorsey started his Caprice via remote start, headed outside, and then got into his vehicle. One of the men by the Tahoe approached Dorsey, "pulled a gun" on him, and ordered him to drop his keys. A second man, armed with a rifle, approached Dorsey and said, "[H]e ain't playing." Dorsey testified that this second man motioned at him with the rifle indicating that if Dorsey did not drop the keys he was going to shoot him. Dorsey later identified this second man as Jackson.

Dorsey dropped the keys to the car onto the floor of the Caprice. As he was getting out of the car, the first man went through Dorsey's pockets and took his wallet. Dorsey's cell phone was left in the vehicle. At the same time, someone screamed, "Police." In the near proximity, Officer Walter Jones of the Kansas City, Kansas, Police Department was conducting a routine traffic stop. Dorsey ran to Jones, told him he had been robbed, and pointed to his car leaving the area. Jones testified Dorsey was "very upset, very agitated, [and] was really trying to get [Jones'] attention." Jones initiated pursuit of the vehicle, but the pursuit was shortly taken over by other officers, including Officer Matthew Baker. Dorsey told Jones his car and wallet had been taken from him at gunpoint and that he did not know the people who took his car.

2

Baker pursued Dorsey's car into Kansas City, Missouri. During the pursuit Baker noticed only one person in the car and saw that same person, Jackson, get out of the car at the end of the pursuit. The pursuit, lasting approximately 17 minutes, was recorded on Baker's in-car video and played for the jury. At the end of the pursuit while being arrested, Jackson assaulted a law enforcement officer. This incident was on the video as well, but no testimony regarding this assault was elicited during trial.

Officer David Kissee of the Kansas City, Missouri, Police Department was also involved in the pursuit of Jackson. Kissee followed Jackson until the Caprice ran out of gas in front of the Kansas City, Missouri, police headquarters. Kissee's in-car camera also captured a portion of the pursuit and Jackson's arrest; this video was played for the jury. Law enforcement found Dorsey's wallet and cell phone in the Caprice but did not recover a gun.

Jackson was charged with one count each of aggravated robbery, eluding a police officer, and aggravated assault of a law enforcement officer. Before trial, Jackson pled guilty to eluding law enforcement and aggravated assault of a law enforcement officer and proceeded to trial only on the aggravated robbery charge.

At trial, Dorsey admitted to having prior burglary and theft convictions and that while he was incarcerated for one of those convictions he was housed in the same pod as Jackson. Dorsey testified that while he and Jackson were incarcerated together, Jackson approached Dorsey and asked Dorsey to say that Jackson did not rob him. Dorsey signed an affidavit to this effect because, although Jackson never threatened him, he did not want there to be any problems while incarcerated. At trial, Dorsey maintained that Jackson robbed him and that his affidavit was untruthful.

3

Jackson testified that he did not steal Dorsey's car; rather, he had purchased the car from Dorsey a month earlier. Jackson also claimed he did not have a gun and that he did not ask Dorsey to write the affidavit changing his story.

The jury found Jackson guilty of aggravated robbery. The district court sentenced him to 216 months' imprisonment with 36 months' postrelease supervision.

Jackson timely appeals.

DID THE STATE VIOLATE JACKSON'S CONSTITUTIONAL RIGHT TO A SPEEDY TRIAL?

Jackson first argues that his constitutional right to a speedy trial was violated due to a delay of 549 days between the date he was charged and the date of his trial. Jackson does not argue that the State violated his statutory right to a speedy trial, and he acknowledges that while he was awaiting trial he was incarcerated on another probation violation case which disqualifies him from the protections of K.S.A. 2015 Supp. 22-3402(a).

Whether a defendant's constitutional right to a speedy trial has been violated is a question of law over which this court has unlimited review. *State v. White*, 275 Kan. 580, 598, 67 P.3d 138 (2003).

The Sixth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, and § 10 of the Kansas Constitution Bill of Rights guarantee an accused the right to a speedy trial.

"The United States Supreme Court set forth a balancing test for determining whether an accused has been denied his or her constitutional right to a speedy trial in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Kansas adopted

4

this test in *State v. Otero*, 210 Kan. 530, 502 P.2d 763 (1972). The following factors were set forth in *Barker*: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. 407 U.S. at 530." *State v. Mann*, 274 Kan. 670, 701, 56 P.3d 212 (2002).

"None of these four factors, standing alone, is sufficient for finding a violation. Instead, the court must consider them together along with any other relevant circumstances." *State v. Rivera*, 277 Kan. 109, 113, 83 P.3d 169 (2004). Each factor will be considered in turn.

## A. *The length of the delay*

"The length of the delay between arrest and trial is key to the analysis. Until the delay rises to the level of being presumptively prejudicial, it is not necessary to inquire into the other *Barker* factors." *State v. Davis*, 277 Kan. 309, 334, 85 P.3d 1164 (2004); see *Barker*, 407 U.S. at 530. Jackson must first show that the length of delay between arrest and trial was presumptively prejudicial.

The following chronology of events is relevant to this issue:

| Event | Date | Days | Attributed to State | Attributed to Jackson |
|---|---|---|---|---|
| Jackson charged | May 18, 2012 | — | — | — |
| Jackson arrested/first appearance (in custody until trial) | May 21, 2012 | 3 | 3 | 0 |
| Scheduling Docket (not held; continued by Jackson) | June 5, 2012 | 15 | 15 | 0 |
| Continued Scheduling Docket | June 12, 2012 | 7 | 0 | 7 |
| Preliminary Hearing (held; Jackson disagreed with counsel's tactics and requested continuance to hire new counsel; granted) | July 12, 2012 | 30 | 30 | 0 |
| Scheduling Docket (continued by Jackson) | July 24, 2012 | 12 | 0 | 12 |
| Continued Scheduling Docket (continued by Jackson) | August 7, 2012 | 14 | 0 | 14 |

5

| | | | | |
|---|---|---|---|---|
| Second Continued Scheduling Docket | August 14, 2012 | 7 | 0 | 7 |
| Preliminary Hearing (continued by State; witness had surgery) | September 27, 2012 | 44 | 44 | 0 |
| Scheduling Docket | October 2, 2012 | 5 | 5 | 0 |
| Preliminary Hearing (continued by State; victim not personally served and did not appear) | October 25, 2012 | 23 | 23 | 0 |
| Continued Preliminary Hearing (victim again did not appear; warrant for contempt issued; probable cause found for Counts II and III; Count I continued) | January 10, 2013 | 77 | 77 | 0 |
| Pretrial Conference (Jackson requested plea hearing) | January 18, 2013 | 8 | 8 | 0 |
| Plea Hearing (no plea reached) | March 1, 2013 | 42 | 0 | 42 |
| Preliminary Hearing (probable cause found for Count I; jury trial set for June 10, 2013, on all counts) | March 21, 2013 | 20 | 20 | 0 |
| Hearing on Motion (Jackson's attorney withdrew due to conflict; jury trial cancelled) | June 5, 2013 | 76 | 76 | 0 |
| Pretrial Conference (continued by Jackson) | June 19, 2013 | 14 | 0 | 14 |
| Continued Pretrial Conference (jury trial set for September 16, 2013) | July 5, 2013 | 16 | 0 | 16 |
| Jackson moved to continue trial; granted; continued to November 18, 2013 | August 7, 2013 | 33 | 0 | 33 |
| Jury Trial | November 18, 2013 | 103 | 0 | 103 |
| | Totals: | 549 | 301 | 248 |

Approximately 10 months of the delay are attributed to the State.

"In determining whether a defendant's constitutional right to a speedy trial has been violated by delay between arrest and trial, whether the length of delay is presumptively prejudicial depends on the peculiar circumstances of each case, and the mere passage of time is not determinative." *State v. Weaver*, 276 Kan. 504, Syl. ¶ 3, 78 P.3d 397 (2003). In *Weaver*, the charge was one count of possession of cocaine with intent to sell, and the evidence was straightforward. The *Weaver* court found that "[t]he tolerable delay for an ordinary crime is less than for a complex one" and a 15-month delay was presumptively prejudicial. 276 Kan. at 511; but see *State v. Hayden*, 281 Kan.

6

112, 128, 130 P.3d 24 (2006) (13-month delay not presumptively prejudicial when crimes were second-degree murder, second-degree attempted murder, and aggravated burglary); *Davis*, 277 Kan. at 335-36 (15-month delay not presumptively prejudicial when charge was aggravated kidnapping and attempted rape and competency issues were addressed before trial); *State v. Hill*, 257 Kan. 774, 779, 895 P.2d 1238 (1995) (11-month delay not presumptively prejudicial when charge was four counts of aggravated burglary, three counts of theft, three counts of rape, two counts of aggravated robbery, and one count of aggravated kidnapping); *State v. Hoffman*, No. 98,045, 2008 WL 5401319, at *1 (Kan. App. 2008) (9-month delay not presumptively prejudicial constitutionally where crime was driving under influence).

In *Rivera*, 277 Kan. at 113-14, the Kansas Supreme Court found a 244-day delay to be presumptively prejudicial where the defendant was charged with aggravated robbery, conspiracy to commit aggravated robbery, aggravated assault, and theft—serious yet straightforward crimes. Here, Jackson was charged with aggravated robbery, aggravated assault of a law enforcement officer, and eluding a police officer. Because Jackson's charges were not complex, this delay was presumptively prejudicial and weighs towards a violation of Jackson's constitutional speedy trial right. Therefore, we must examine the remaining three *Barker* factors.

B.    *The reason for the delay*

Under the second *Barker* factor, we evaluate

"the reason[s] the government assigns to justify the delay. Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a

7

valid reason, such as a missing witness, should serve to justify appropriate delay." 407 U.S. at 531.

Here, the State's brief attributes the delay to the following:

"The State was ready to proceed with all witnesses at the first preliminary hearing [on July 12, 2012]. The defendant continued the matter over the State's objection. After this delay, the State had issues with multiple witnesses. But for the defendant's continuance of the first setting, such delays would not have occurred and the trial could have been held much sooner . . . . The State had multiple material witness issues at three subsequent preliminary hearing settings. The first material witness problem was due to Officer Baker having surgery and [he] was unable to testify. The matter was eventually reset for prelim in October of 2012. Due to previous cooperation of the victim, there was no indication that the State needed to compel attendance of Dorsey [the complaining witness] at the October setting. He failed to appear at that setting. In January 2013, Dorsey was personally served and failed to appear again. This prompted the issuance of a contempt warrant to secure Dorsey's appearance. Dorsey complied at the next hearing. Dorsey appeared in March of 2013 to testify about the aggravated robbery charge."

The reasons given by the State for the delay are adequately reflected in the appearance docket and record on appeal. In fact, the case was set for a jury trial early on, but 5 days before the scheduled date, Jackson's retained counsel withdrew due to a conflict. The district court informed Jackson that any delay because of counsel's withdrawal would be attributed to Jackson. The withdrawal of Jackson's counsel caused a 166-day delay out of the total of 248 days of delay attributed to Jackson.

The State's delay of missing material witnesses was a valid delay; therefore, this factor weighs against a violation of Jackson's constitutional speedy trial right.

8

C.    *Jackson's assertion of his speedy trial right*

Under the third *Barker* factor, we consider whether the defendant asserted his or her speedy trial right. 407 U.S. at 530. "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U.S. at 532.

Jackson asserted his speedy trial right via a pro se motion to dismiss filed on May 9, 2013, and a pro se renewed motion to dismiss filed on May 23, 2013. The State does not dispute that Jackson asserted his right to a speedy trial. This factor weighs towards a violation of Jackson's constitutional speedy trial right.

D.    *Prejudice to Jackson*

Finally, we must assess the prejudice Jackson suffered as a result of the delay. "Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." 407 U.S. at 532. Three factors are considered when evaluating the prejudice to the defendant: "oppressive pretrial incarceration; the defendant's anxiety and concern; and, most importantly, the impairment of his or her defense." *Rivera*, 277 Kan. at 118.

1.    *Oppressiveness of Jackson's pretrial incarceration*

In evaluating the oppressiveness of a defendant's pretrial incarceration, we consider both the lost time to the defendant and how that lost time impacted the defendant's ability to adequately prepare a defense:

> "The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time.

9

Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious." *Barker*, 407 U.S. at 532-33.

In *Rivera*, 277 Kan. at 119, our Supreme Court found that the defendant was not oppressively incarcerated because he was being held for a parole violation in California in addition to the charges in the case. Similarly, Jackson was in custody on a pending probation violation in addition to the present case; therefore, we conclude that Jackson was not oppressively incarcerated.

2.      *Jackson's anxiety and concern*

We next consider the amount of anxiety and concern the pending charges and incarceration caused Jackson. *Barker*, 407 U.S. at 532. In *Rivera*, 277 Kan. at 119, the Supreme Court found that the defendant's repeated involvement with the criminal justice system overshadowed any anxiety and concern he may have felt. The defendant had a criminal history score of C, in addition to multiple escapes from custody and parole violations. Here, Jackson had a criminal history score of B, probation violations, and two prior person felonies. His experience with the criminal justice system overshadows any claim he has about being concerned and anxious over the charges in this case.

3.      *The impairment of Jackson's defense*

The most important factor in evaluating whether a defendant was prejudiced by a lengthy trial delay is whether the lengthy delay impaired the defendant's ability to prepare a defense because

"the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the

10

distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown." *Barker*, 407 U.S. at 532.

Here, the witnesses did not die or disappear during the delay nor did they have any issues accurately recalling events. In fact, as the district court stated, the delay may have even been favorable to Jackson. Dorsey, the alleged victim and complaining witness, was housed in the same jail pod with Jackson during the delay. Dorsey then submitted an affidavit recanting his allegations against Jackson. Although he testified contrary to this affidavit at Jackson's trial, the existence of this affidavit called into question the credibility of the State's key witness, suggesting that the delay may have actually helped Jackson's defense. Therefore, we conclude there was no impairment of Jackson's defense attributable to the delay.

Viewing the *Barker* factors as a whole, we hold Jackson's constitutional right to a speedy trial was not violated.

## DID THE STATE IMPROPERLY USE PEREMPTORY STRIKES AGAINST POTENTIAL MINORITY JURORS IN VIOLATION OF *BATSON*?

Jackson next argues on appeal that the State improperly used half of its peremptory strikes to remove minority prospective jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

The United States Supreme Court has held that a state's use of peremptory challenges must comply with the Fourteenth Amendment to the United States Constitution, meaning a state may not select or remove prospective jurors from the jury on the basis of race. 476 U.S. at 89. Challenges to race-based peremptory strikes, referred to as *Batson* challenges,

11

"are subject to a three-step analysis. Each step is governed by its own standard of review. [Citations omitted.] Under the first step, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step. [Citation omitted.] But if that prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion. [Citation omitted.]

"In the third step, the district court determines whether the defendant has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations because usually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard. [Citations omitted.]" *State v. McCullough*, 293 Kan. 970, 992, 270 P.3d 1142 (2012).

Under the first step of a *Batson* challenge, a

"defendant need no longer establish that he or she is a member of a cognizable minority group since the focus is now on the individual rights of jury members not to be excluded on the basis of race or sex. [Citations omitted.] . . . [I]n order to establish a prima facie case, the defendant need only show that the prosecution has exercised peremptory challenges to remove from the venire members of a certain race . . . and that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the jurors from the jury on account of their race or gender." *State v. Edwards*, 264 Kan. 177, 193-94, 955 P.2d 1276 (1998).

A '"pattern"' of strikes against minority jurors is a relevant circumstance that may give rise to an inference of purposeful discrimination. *Batson*, 476 U.S. at 97.

12

To establish his prima facie case, Jackson argues that prospective jurors 8, 18, 21, and 30 were struck on the basis of their race. Jurors 18, 21, and 30 identified as black and juror 8 identified as black and white. Of the State's eight total peremptory strikes, three identified as black, one identified as black and white, one identified as Hispanic, and three identified as white. Because the State used its peremptory challenges equally between minority and nonminority potential jurors, Jackson has not established a prima facie case that the State used its peremptory challenges improperly on the basis of race. The State did not commit a *Batson* violation.

On appeal, Jackson also discusses the use of peremptory challenges on Hispanic prospective jurors. However, this issue was not raised before the district court.

> "Although ordinarily appellate courts will not consider an issue which the parties do not raise in the district court or on appeal, the court does have power to do so in exceptional circumstances where consideration of the new issue is necessary to serve the interests of justice or to prevent a denial of fundamental rights." *State v. Bell*, 258 Kan. 123, Syl. ¶ 1, 899 P.2d 1000 (1995).

Here, the exclusion of the one Hispanic prospective juror does not affect our conclusion that the State did not commit a *Batson* violation.

### DID THE DISTRICT COURT ERR IN LIMITING JACKSON'S DIRECT EXAMINATION AND CROSS-EXAMINATION OF WITNESSES?

Next Jackson argues that the district court erred when it limited the direct examination of Detective Garrison and the cross-examination of Dorsey, the complaining witness.

The trial court controls the scope of cross-examination, and "a district court judge's 'decision to limit cross-examination is reviewed using an abuse of discretion

13

standard.'" *State v. Parks*, 294 Kan. 785, 797, 280 P.3d 766 (2012) (quoting *State v. Corbett*, 281 Kan. 294, 307-08, 130 P.3d 1179 [2006]). "Judicial discretion can be abused in three ways: (1) if no reasonable person would have taken the view adopted by the trial court; (2) if the judicial action is based on an error of law; or (3) if the judicial action is based on an error of fact." *State v. Mosher*, 299 Kan. 1, 3, 319 P.3d 1253 (2014).

"A party being limited by the exclusion of evidence must sufficiently proffer the substance of the evidence to preserve the issue on appeal." *State v. Swint*, 302 Kan. 326, 332, 352 P.3d 1014 (2015); see K.S.A. 60-405. "Failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion." *State v. Hudgins*, 301 Kan. 629, 651, 346 P.3d 1062 (2015).

However, "no formal proffer is required if an adequate record [sufficiently] discloses the evidence sought to be introduced. Answers to discovery, the parties' arguments, or in-court dialogue" may be a sufficient proffer depending on the circumstances. *Swint*, 302 Kan. at 332. Our Supreme Court "has considered information made known both contemporaneously with the trial court's ruling and provided after the trial has concluded" when assessing the adequacy of a proffer of excluded evidence. 302 Kan. at 332-33.

A.    *The Cross-Examination of Dorsey*

Jackson argues that the limitation of his cross-examination of Dorsey excluded relevant evidence in violation of his right to confront the witness testifying against him, guaranteed to him by the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.

Dorsey was previously convicted of burglary in a completely unrelated matter. Jackson requested that he be allowed to ask Dorsey about this conviction and use the evidence to question his credibility. The district court permitted Dorsey to be questioned about the burglary for impeachment purposes should the occasion arise at trial. Jackson sought to question Dorsey on the terms of his sentence in the unrelated burglary case at trial. Before trial, the following exchange regarding the cross-examination of Dorsey occurred between the district court, the State, and Jackson's counsel:

"MR. WILLIAMS:  Judge, on the burglary plea by the alleged victim, he got a departure and part of the reason was he provided cooperation, and I believe that's in this case.

"[THE STATE]:  Go ahead. Make your record and I'll respond.

"MR. WILLIAMS:  Judge, he was B history on the level 7 burglary. He should have been prison bound, but they agreed to probation in this case. I would like to show that to the jury.

"[THE STATE]:  And judge, this is—the journal entry that he's requesting to admit is the same journal entry that we talked about earlier. I think the defense attorney, Mr. Williams, can confront the victim about that and impeach him. If he denies it, he can—he can maybe get it in through evidence there, but same objection as before.

"I will state for the record that the plea agreement for the victim in his burglary and theft case didn't have anything to do with cooperation in this case. Now, it could be at sentencing his defense attorney said he's been really helpful or something like that. So they threw that in as another reason amongst several other reasons that are in that journal entry.

"I'm not sure what happened at sentencing, but I'm fairly confident that . . . it was not a bargained for agreement. And Mr. Williams, of course, can try to cross-examine as to that, but that's my record.

"MR. WILLIAMS:  And Judge, for the record, I would start out with cross-examination. I don't intend to just—

"THE COURT:  I think as long as if he admits he has a—he pled guilty or was convicted of burglary, that's where it ends. And I don't think you can go into the plea agreement somebody got in a totally unrelated case, unless you somehow have—can produce evidence to present to the Court and not as part of questioning that it was

15

somehow directly related to this particular case. I don't think you can get into the underlying plea of a totally collateral matter.

"MR. WILLIAMS: And Judge, just for the record, I do recall that that burglary case had a codefendant. So it could be, you know, that he provided cooperation against the codefendant in that case. All we've got in that journal entry is 'provided cooperation.'

"THE COURT: That's got nothing to do with this case, if he's the victim in this case—or the alleged victim in this case."

"[THE STATE]: Right.

"THE COURT: I think it would be different, obviously, if he was a codefendant in this case and was testifying, and obviously all of the terms of whatever plea he entered for the State to secure his testimony to testify against the codefendant would clearly be admissible. But I think this is a totally collateral matter.

"MR. WILLIAMS: Okay. And Judge, I understand and respect the Court's ruling. I will conduct myself accordingly. I may put the State on notice. I don't intend to do this now but . . . I may add [the defense lawyer and the prosecutor] to the witness list because of this.

"THE COURT: You can go talk to them if you want but we'll see.

"MR. WILLIAMS: Okay. Nothing further, Your Honor."

Jackson's counsel made no other proffer of evidence as to what Dorsey's possible testimony would include, nor did he provide any evidence to the district court about the alleged link between Dorsey's sentencing in a completely unrelated case, in which he was the codefendant, and his testimony in this case, in which he was the victim. The only evidence presented that could be considered a proffer, formal or informal, is two of Jackson's counsel's conflicting statements that (1) "he got a departure and part of the reason was he provided cooperation, and I believe that's in this case," and (2) "I do recall that that burglary case had a codefendant. So it could be, you know, that he provided cooperation against the codefendant in that case. All we've got in the journal entry is 'provided cooperation.'" The district court ruled that Jackson could not question Dorsey on the events surrounding his sentence in the unrelated case unless Jackson could provide evidence that the two cases were related.

16

After this ruling, Jackson's counsel did not provide the district court with any more information connecting Dorsey's sentence in his completely unrelated case and his testimony as a victim in Jackson's case. There is no true disclosure on the record of the evidence Jackson sought to be introduced by Dorsey except the two conflicting statements from Jackson's attorney. There is no record of what, if anything, came from the discussion between Jackson's counsel, the prosecutor, and Dorsey's counsel in Dorsey's burglary case. Based on the information provided in the record, it is impossible to know what the content of this testimony would have been, and there is no basis to consider whether the trial court abused its discretion. See *Hudgins*, 301 Kan. at 651. Therefore, this issue is not properly preserved for appeal.

B.      *The Direct Examination of Garrison*

Jackson also argues the district court erred in preventing him from exposing Garrison's lack of knowledge on direct examination. The State argues that Jackson has abandoned this issue on appeal. Jackson's brief presents no argument on this issue and only mentions this argument in passing twice. He first mentions this argument stating: "Mr. Jackson argues that by preventing him from cross-examining . . . Garrison on her investigation, the district court excluded relevant evidence, which violated his right to confront the witnesses testifying against him . . . ." Jackson next mentions this for the second and last time, stating: "Here, the district court limited cross-examination of two of the State's witnesses: Dorsey and Garrison. Doing so prevented Mr. Jackson from truly confronting the witnesses against him, and from exposing Dorsey's bias and Garrison's lack of knowledge." The direct examination of Garrison is not mentioned again, and Jackson does not respond to the State's argument that he abandoned this issue on appeal in his reply brief.

"When a litigant fails to adequately brief an issue it is deemed abandoned." *State v. Sprague*, 303 Kan. 418, 425, 362 P.3d 828 (2015). Jackson's argument that the district

17

court improperly limited the direct examination of Garrison is merely raised incidentally; therefore, we consider it abandoned.

## DID THE DISTRICT COURT ERR IN ADMITTING EVIDENCE OF OTHER CRIMES?

At trial, the district court admitted two police in-car videos over Jackson's objection. These videos showed the events immediately after Jackson stole Dorsey's car. Jackson argues that the district court erred when it admitted these videos because he pled guilty to the crimes of eluding a police officer and aggravated assault on a law enforcement officer. Jackson claims the videos were evidence of other crimes and, thus, inadmissible under K.S.A. 2015 Supp. 60-455.

K.S.A. 2015 Supp. 60-455 provides in relevant part:

> "(a) Subject to K.S.A. 60-447, and amendments thereto, evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion.
> "(b) Subject to K.S.A. 60-445 and 60-448, and amendments thereto, such evidence is admissible when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."

Although the old rule of res gestae no longer serves as an independent basis of admission of evidence, evidence of other crimes committed during the surrounding circumstances of the crime charged is not automatically inadmissible; "rather, if the evidence is relevant it can be admitted unless a rule of evidence prevents its admission. See K.S.A. 60-407 ('Except as otherwise provided by statute . . . (f) all relevant evidence is admissible.')." *State v. King*, 297 Kan. 955, 964, 305 P.3d 641 (2013). "'K.S.A. 60-455 does not prohibit the admission of evidence regarding other crimes and civil wrongs if the

18

evidence relates to acts committed as part of the events surrounding the crimes or civil wrongs at issue in the trial.'" *State v. Charles*, 304 Kan. 158, 175-76, 372 P.3d 1109 (2016) (quoting *King*, 297 Kan. 955, Syl. ¶ 1).

Here, the evidence the district court admitted was evidence of Jackson's actions mere moments after Jackson stole Dorsey's vehicle. Based on the testimony at trial and the jury's guilty verdict, Jackson robbed Dorsey of his car at gunpoint. During the robbery, someone yelled, "Police." Dorsey, seeing an officer in the area, went immediately to him and reported that his car had just been stolen at gunpoint and pointed out his car as Jackson drove it away. Law enforcement in Kansas City, Kansas, chased the stolen vehicle until law enforcement in Kansas City, Missouri, took over the chase. Law enforcement's pursuit of Jackson ended when the stolen vehicle ran out of gas in front of the Kansas City, Missouri, police station. Jackson was taken into custody and while doing so assaulted a law enforcement officer.

The district court ruled that the videos of Jackson eluding police and assaulting a law enforcement officer went to prove Jackson's intent to commit aggravated robbery. We agree. These events do not depict prior crimes; rather, this is evidence of the surrounding circumstance of Jackson's crime and these events occurred as part of the crime charged. See *Charles*, 304 Kan. at 175; *King*, 297 Kan. at 964. Thus, this evidence is not K.S.A. 2015 Supp. 60-455 evidence.

Jackson's related argument that a limiting instruction should have been given concerning this evidence is also without merit as we have concluded that the evidence did not constitute prior bad acts evidence under K.S.A. 2015 Supp. 60-455.

Next Jackson argues that the district court erred when it failed to give a jury instruction for robbery, a lesser included offense of aggravated robbery. The State in response argues that this jury instruction was not factually appropriate and, thus, the district court did not err.

> "'For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015) (quoting *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012]).

When the failure to give a lesser included offense jury instruction is challenged on appeal, we apply the same analytical framework as in *Woods* and must first determine if the issue was properly preserved. See *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014).

> "K.S.A. 22-3414(3) establishes a preservation rule for instruction claims on appeal. It provides that no party may assign as error a district court's giving or failure to give a particular jury instruction, including a lesser included crime instruction, unless: (a) that party objects before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds for objection; or (b) the instruction or the failure to give the instruction is clearly erroneous. If an instruction is clearly

erroneous, appellate review is not predicated upon an objection in the district court."
*State v. Williams*, 295 Kan. 506, Syl. ¶ 3, 286 P.3d 195 (2012).

At trial, after the presentation of the evidence and outside of the presence of the jury, the following interaction occurred between the district court, the State, and Jackson's counsel when the parties were asked if they had any objection to the district court's proposed jury instructions:

> "THE COURT: Any objections to the instructions as prepared?
>
> "MR. WILLIAMS: No.
>
> . . . .
>
> "MR. WILLIAMS: Judge, I assume that—I didn't hear you, but you're not submitting LIO's on this?
>
> "THE COURT: I don't know what an LIO is.
>
> "MR. WILLIAMS: A lesser included offense.
>
> "THE COURT: Oh. Well, you haven't asked for any. Do you think any should be given?
>
> "MR. WILLIAMS: There was—there is evidence to support there was no gun.
>
> "THE COURT: I don't think there is. What are you asking for?
>
> "MR. WILLIAMS: Well, Judge, my client does not want me to ask for robbery, but that would be—
>
> "THE COURT: Robbery can be a lesser, but robbery is not always a lesser. Robbery is given if there is evidence to support a robbery charge. So say, for example, and I think in this type of situation I think it would be if, say, somebody had their hand in their pocket and they didn't actually see a gun, robbery may be justified. If it wasn't a firearm, if it was some other type of weapon, it might be justified. But in this particular case the evidence is undisputed that firearms were involved, and on that basis I don't think I have to give a lesser.
>
> "MR. WILLIAMS: I understand, Your Honor.
>
> "THE COURT: And you said he doesn't want robbery anyway?
>
> "MR. WILLIAMS: That's correct, Your Honor.
>
> "THE COURT: Anything from the State?

21

"[THE STATE]: Judge, I agree that robbery in this case is not factually appropriate because the only testimony that there was a crime committed was from the victim, and he said that the defendant had the gun. So if there was a crime committed, it was an aggravated robbery, not a robbery.

"THE COURT: Okay."

Here, not only did Jackson not object to the lack of a lesser included offense jury instruction, but Jackson's counsel also specifically told the district court he did not want a jury instruction for the lesser included offense.

In *State v. Angelo*, 287 Kan. 262, 278-80, 197 P.3d 337 (2008), our Supreme Court held that a defendant cannot complain on appeal of a district court's action when the defendant invited and led the district court into error by requesting the court not give a lesser included offense instruction even in light of a district court's duty to instruct on all lesser included offenses reasonably justified by the evidence presented at trial. The *Angelo* court further noted: "[A] denial of relief is particularly appropriate where [the defendant] twice told the court personally that he did not want the instruction, even after acknowledging that he could not appeal from the consequences of his decision." 287 Kan. at 280.

Here, although Jackson did not personally tell the district court he did not want the jury instruction, Jackson's counsel twice told the district court his client did not want a jury instruction for robbery. In accordance with *Angelo*, 287 Kan. at 280, a defendant cannot state he or she does not want a jury instruction for a lesser included offense and then complain about the lack of such jury instruction on appeal. See also *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014) (litigant may not invite error then complain of error on appeal). Because Jackson invited this error, the district court did not err in failing to give a jury instruction on the lesser included offense of robbery.

22

## DID CUMULATIVE ERRORS DEPRIVE JACKSON OF A FAIR TRIAL?

Finally, Jackson argues that because of the numerous errors he claims were committed by the trial court, cumulative error resulted and necessitates reversal of his conviction. Unfortunately for Jackson, "'[c]umulative error will not be found when the record fails to support the errors raised on appeal by the defendant.'" *State v. Novotny*, 297 Kan. 1174, 1191, 307 P.3d 1278 (2013) (quoting *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 [2009]). Because we find no errors in Jackson's conviction, there is no cumulative error here.

Affirmed.