NOT DESIGNATED FOR PUBLICATION

No. 122,217

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARCUS L. ROSEBUD,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed July 30, 2021.
Affirmed.

*Peter Maharry*, of Kansas Appellate Defender office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek
Schmidt*, attorney general, for appellee.

Before ATCHESON, P.J., HILL and CLINE, JJ.

PER CURIAM:  In this criminal appeal, Marcus L. Rosebud claims he did not
receive a fair trial and asks us to overturn his convictions. He raises several issues about
the admission and exclusion of evidence at trial as well as a jury instruction error and a
jury management error. Our review of the record leads us to hold that none of his claims
of error are reversible. We affirm Rosebud's convictions.

1

*This case begins with a home invasion in Baldwin City.*

One evening in November 2018, two men illegally entered the home of Madison Warmington in Baldwin City. She was at home with her three young children. We begin with her account of what happened.

According to Warmington, La Rhon Lewis had spent the night at her house. After she dropped her children at school in the morning, she drove Lewis back to Kansas City and then did errands in the city. Lewis sent her a text wanting to stay again, so she picked him up on her way back home, picked up her children, and they all went back to her house.

At some point, Lewis said he needed to get his phone charger out of Warmington's car. A few minutes later, while Warmington was sitting in the living room with her three children, two men walked into her house. One of them—who Warmington identified as Rosebud—held her at gunpoint. The other man started ransacking the house and asked where the drugs and money were. Warmington, at first, refused Rosebud's command to hand over her phone. But she complied after he pushed her down onto the couch and told her: "Don't do this in front of the kids." The two men eventually left with her phone, a debit card, her driving license, and her social security card. She tried to follow them out of the house, but someone was holding her front door shut. She looked out the window and saw someone going through her car. Once she managed to get out, she saw that her car door was open and two men ran across her yard into another car. She then ran to the neighbors to call the police.

About the same time, a neighbor saw three hooded men leave Warmington's home and get into a dark gray sedan with a blue light above the license plate. The car left the neighborhood. The neighbor described them as African-American men wearing hoodies. The neighbor then saw Warmington, distraught, leaving her house.

2

Area police forces were notified. After a Gardner Police officer noticed a dark sedan with a blue light over the license tag, he and several officers performed a traffic stop and detained the car's four occupants. Rosebud was one of those occupants, and he owned the car. The other three were Jarnneil Davis, who was driving, Percy Birl, and Lewis. When officers searched the car, they found two handguns along with bank and ID cards belonging to Madison.

The State charged Rosebud with eight crimes: aggravated burglary, conspiracy to commit aggravated burglary, aggravated robbery, conspiracy to commit aggravated robbery, burglary of a motor vehicle, and three counts of aggravated child endangerment.

Rosebud testified in his defense. He said that Davis had asked him to drive him around to run some errands, and Davis offered to pay for the gas. Davis was with Birl when Rosebud picked him up. The three of them drove to Davis' friend's house in south Kansas City; Davis came out with a plastic bag. Birl then told Rosebud that they needed to go pick up a friend who had been staying at a woman's house for a few days and needed a ride.

On the way there, Rosebud heard Davis say on a call that he was planning to rob someone. Davis then tried to give Rosebud a mask and a pair of latex gloves and said that Rosebud would be able to handle it. Rosebud did not want to get involved; he kept making excuses and trying to talk Davis and Birl out of their plan to rob the woman Lewis had been staying with. Rosebud thought he had succeeded and that they were just going to pick up Lewis. Rosebud parked the car at a Taco Bell while they tried to figure out where Warmington's house was. Rosebud was tired, so he let Davis drive.

Davis drove up to Warmington's house, then asked Rosebud if he was ready and handed him a silver and black gun. Davis told him not to use the gun under any circumstances, and Birl said that if Rosebud did, then Birl would have to shoot the

3

woman and her kids because they would be witnesses. Rosebud continued to try to talk them out of the robbery and began arguing with Birl. Birl told Rosebud, "You [*sic*] either with me or against me," and then got out of the car. After that, Rosebud thought that Birl would shoot him if he did not go along with the plan. Davis told Rosebud to go several times; when Davis looked away, Rosebud put the gun under the seat and then got out and followed Birl. Rosebud thought that he could control the situation and stop anyone from getting hurt if he went in.

Rosebud's account of the robbery mostly matches Warmington's. The difference was that Rosebud claimed to have left the gun in the car. He also denied pushing Warmington when trying to get her phone. And he said that Birl had rummaged through Warmington's car.

At Rosebud's request, the court gave the jury an instruction on compulsion. That instruction told the jury that Rosebud would not be criminally liable if he "acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would be inflicted upon him if he did not act as he did[.]"

The jury deliberated for two hours on Friday afternoon. One of the jurors had travel plans that evening and could not return Monday, so the court excused that juror and replaced her with an alternate. On Monday, the jury deliberated until the late afternoon. The jury reached a verdict on six of the eight counts—finding Rosebud guilty of conspiracy to commit aggravated burglary, conspiracy to commit aggravated robbery, burglary of a vehicle, and the three counts of aggravated child endangerment.

The jury did not reach a verdict on the aggravated burglary or aggravated robbery charges. But Rosebud and the State agreed that the State would not pursue those charges, and the parties would both recommend to the court to impose a controlling 50-month

4

prison sentence. The court followed that recommendation and sentenced Rosebud accordingly.

Three of the six issues Rosebud raises in this appeal challenge various evidentiary rulings by the court. He claims the trial court erred when it

1. limited questioning and excluded relevant defense exhibits;
2. admitted evidence of Rosebud's prior bad acts; and
3. excluded portions of Rosebud's interview with the police.

Next, Rosebud challenges the verdict forms used in his case. He also claims that the court erred when it failed to instruct the jury that deliberations needed to start over after seating an alternate juror. And finally, Rosebud contends that cumulative errors denied him his constitutional right to a fair trial. We will take up those issues in that order.

*Before and during the trial, the court did not admit all of the evidence requested by Rosebud.*

Before trial, the State moved to limit the evidence Rosebud could introduce at trial. It sought to limit evidence of the alleged gang affiliation or criminal history of the father of Warmington's children, Warmington's warrant status, and any self-serving statements about Rosebud having no interest in committing the crime; unless Rosebud chose to testify. The State cited the example of Rosebud's statement that he had been planning to apply to the Kansas City Police Department.

At the hearing on the motion, Rosebud asserted that information about the father was relevant to the State's allegation that the intruders had been looking for guns and money. The court rejected that, saying that the evidence would cast Warmington in a bad

light without being relevant to an element the State had to prove. The court also excluded evidence of Warmington's outstanding warrant as irrelevant. It reserved ruling on self-serving statements until they were presented later at trial.

At trial, defense counsel sought to question Warmington during cross-examination about her children's father and her relationship with Lewis. The court stuck to its pretrial ruling on evidence about the father, ruling that it was irrelevant. The court also sustained the State's objection to relevance when defense counsel asked, "You didn't tell [Lewis] that you wanted to have a child with him?"

Rosebud was also unsuccessful in admitting dozens of exhibits summarized below during the State's case-in-chief:

- A lengthy timeline of data extracted from Rosebud's phone starting several days before the robbery. Defense counsel argued that the text messages showed that Rosebud had not spoken with his alleged coconspirators about planning the robbery. The district court ruled the timeline was irrelevant. The document was several days of text messages, mostly with people unrelated to the robbery. It also ruled the messages were hearsay because they were statements by Rosebud that he was trying to introduce into evidence when he was not available to be cross-examined about them.

- A timeline of data extracted from Lewis' phone starting about a week before the robbery and dozens of related exhibits that were mostly messages, photos, and pictures sent between Lewis and Warmington; the gist of those exhibits is that Lewis and Warmington were in a sexual relationship. Defense counsel argued that these were relevant to show the relationship between them and the information could be used to impeach Warmington because she had testified that Lewis was just a friend and they were not in a relationship. The district court found that the exhibits were not relevant. It found that the purpose of the

6

timeline was just to portray Warmington in a negative light and it had nothing to do with whether the crimes were committed.

- Two documents from Rosebud's phone. One was a Kansas City, Missouri Police Department Entry Police Officer Candidate Preparation Manual. The other was a manual for a security company. Defense counsel argued that these corroborated statements in Rosebud's police interview that he worked security and wanted to be a police officer. The district court excluded those documents as irrelevant.

*We hold the court correctly ruled this evidence is irrelevant.*

When seeking the admission of evidence, a party must show the evidence is probative and material. Evidence is material when the fact it supports is in dispute or in issue in the case; evidence is probative if it has any tendency to prove any material fact. A trial court's determination that the evidence is probative is reviewed for an abuse of discretion; materiality is subject to de novo review. *State v. Miller*, 308 Kan. 1119, Syl. ¶ 18, 427 P.3d 907 (2018).

The timeline extracted from Rosebud's phone was not relevant to the issues raised at trial. Rosebud contends otherwise, stating that the records are relevant because it showed that he had not been planning the robbery with Lewis and Davis in the days before the robbery.

But the State never claimed that he had agreed with the others at that time. It never disputed Rosebud's assertions that Davis and Birl suddenly suggested the plan to rob Warmington that evening. Indeed, the State's theory of the case was that Rosebud had tried to talk Davis and Birl out of the robbery while driving to Baldwin but that, ultimately, he joined an already existing conspiracy to commit robbery when he picked up the gun from the car and entered Warmington's home. This means that Rosebud's text

7

messages, mostly with people unrelated to the events of that night, are not relevant to the issues at trial.

We also question whether the timeline of data extracted from Lewis' phone and the related exhibits showing exchanges between Lewis and Warmington were relevant to whether Rosebud committed the crimes he was charged with. Rosebud contends that this evidence was relevant because it established the extent of Lewis and Warmington's relationship, and perhaps Warmington exaggerated her testimony to enact some revenge on Lewis. But there is nothing in the record beyond Rosebud's speculation suggesting that Warmington had any improper motive or would exact revenge against Lewis upon a stranger.

Rosebud also contends that it undercuts Warmington's testimony that she and Lewis were in a casual relationship. But the explicit nature of the exchanges is not inconsistent with her testimony that he was a friend and he had been spending the night at her house, so it is unclear how these messages would affect her credibility. The extent of their sexual relationship has nothing to do with whether Rosebud committed these crimes.

Finally, the two training manuals extracted from Rosebud's phone were not relevant to the issues on trial. Whether Rosebud worked as a security guard or aspired to be a police officer does not show whether or not he participated in the robbery. These electronic documents may be evidence of his future desires, but they do not affect the issues raised in this trial. We move to the next evidence question.

*The district court allowed the State to admit evidence that Rosebud had used Davis to obtain false insurance documents and a false doctor's note.*

When the State cross-examined Rosebud, it asked whether Davis had obtained false insurance information for Rosebud. Defense counsel objected, arguing that the State was trying to admit K.S.A. 60-455 evidence. Under that statute, "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." K.S.A. 2020 Supp. 60-455(a). The State argued that Rosebud had put his character on the line by saying that he was not the type of person that would commit this crime. The court explained its ruling on this point, allowing the State to proceed based on K.S.A. 60-447:

> "THE COURT: 60-447 says when the defendant has put his evidence on of his good character that the State can offer to prove guilt with evidence of specific conduct other than the conviction of the crime which tends to prove the truth to be bad.
> "You can procced."

In response, Rosebud admitted that Davis had obtained false car insurance information so Rosebud could avoid getting in trouble for driving without insurance. He also said that Davis had obtained a doctor's note from a medical professional he had never visited to excuse Rosebud from work.

*The district court erred by allowing the State to elicit K.S.A. 60-447 testimony from Rosebud, but that error does not warrant reversal.*

The district court erred in its interpretation of K.S.A. 60-447. But to show this, we must first look at the preceding statute, K.S.A. 60-446.

"When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of

9

specific instances of the person's conduct." K.S.A. 60-446. But the evidence of specific instances is limited by K.S.A. 60-447, which says in part that "evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible." K.S.A. 60-447(a). Combined, the effect of those two statutes is "to make opinion testimony and testimony available as proof of a person's bad character which is relevant, but to reject evidence of specific instances of conduct except evidence of convictions for a crime." *State v. Deaver*, 252 Kan. 149, 158-59, 843 P.2d 695 (1992). In other words, general evidence is admissible under the statute, but evidence of specific violations is not admissible.

Thus, Rosebud correctly contends that when the district court allowed the State to question Rosebud about the false insurance and doctor's note, the State elicited testimony about specific instances that did not lead to a conviction, thus violating K.S.A. 60-447(a).

In response, the State tries to avoid that conclusion by asserting that "it is not clear that the evidence about falsified documents actually touch on Rosebud's character," because Rosebud's actions were neither good nor bad, and therefore K.S.A. 60-447 is not applicable. That is not a convincing argument. Rosebud testified that he used the false insurance information to avoid going to jail and he used the false doctor's note to get out of going to work. Those touch on Rosebud's character, and the district court erred by allowing the questioning. That brings us to the question, is it reversible error?

The Kansas Supreme Court stated the appellate standard of review for a violation of K.S.A. 60-447 in *State v. Angelo*, 287 Kan. 262, 282, 197 P.3d 337 (2008):

> "'Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. Among other things, this court specifically considers whether the error is of such a nature as to

affect the outcome of the trial. [Citations omitted.].'"

The evidence against Rosebud is strong. Rosebud's own testimony shows that he knew Birl and Davis planned to rob Warmington in her home and continued to accompany them. He admitted that he entered Warmington's home, took her phone, and forced her to sit on the couch while Birl rummaged through her apartment. Warmington testified that Rosebud held her at gunpoint. Though Rosebud claimed to have left the gun in the car, the jury rejected that testimony. To convict on the conspiracy charges, the jury was instructed it had to find that Rosebud "acted in furtherance of the agreement by taking a handgun and exiting the vehicle."

Even though Rosebud claimed to have been forced to participate, Birl's comment that Rosebud was either with him or against him before Birl left the car cannot raise a compulsion defense, which requires that Rosebud reasonably believed that death or great bodily harm would be inflicted upon him if he did not participate. See K.S.A. 2020 Supp. 21-5206(a). The statement simply does not imply any threat of violence that is required for a compulsion defense. It is a statement that speaks for itself.

We are not persuaded that the erroneous introduction of this evidence affected the outcome of the trial. We hold that it is not reversible error.

*The court only admitted a part of Rosebud's statement to the police.*

A few weeks after being arrested, Rosebud approached the Baldwin Police Department, saying that he wanted to discuss what happened. The police recorded their interview with him. The State moved to admit a redacted copy of that interview at trial. Defense counsel renewed objections to that redacted copy that he had made during a pretrial hearing.

During that pretrial hearing, the parties and district court worked through the interview to determine whether the State could properly exclude portions of it. Relevant to this appeal, the district court excluded statements

- that were irrelevant and self-serving;
- about the father of Warmington's children having guns and being a gang member; and
- relevant to Rosebud's compulsion defense.

We examine those rulings in that order.

The district court determined that the next statements, as summarized, were irrelevant or self-serving; Rosebud contends these statements were relevant about whether he entered into a conspiracy:

- He does not condone crime and wanted to work for the Kansas City, Kansas Police Department;
- his relationship with Davis—Rosebud said that he recently lent Davis his car and had tried to help Davis get over drug use and keep him out of trouble;
- he entered the house to protect the kids because he was a father; and
- why he reached out to talk to the police and how he wanted to assist them.

Rosebud's comments about his job prospects, his relationship with Davis, and the kind of behaviors he condones are all self-serving. Long-standing Kansas caselaw makes it clear that the defendant's self-serving comments to another person are inadmissible at trial. *State v. Asbell*, 57 Kan. 398, Syl. ¶ 8, 46 P. 770 (1896). As one court has explained: "'Nothing in the Constitution gives an accused the privilege of proffering, through hearsay, his self-serving statements while denying the state access to the rest of the story

12

that could be got at by cross-examination.'" *State v. Stano*, 284 Kan. 126, 133, 159 P.3d 931 (2007). So the district court did not err by excluding these statements.

The district court also excluded as irrelevant these statements, as summarized, about the father of Warmington's children. Rosebud contends these, too, were relevant to the conspiracy charge:

- being told that the father was a drug dealer and had connections;
- Warmington's house being a safe house for drugs and guns; and
- Warmington saying during the robbery that people had come and taken the guns earlier.

These statements are not relevant to the issues raised at trial. As the State argues, the connection between the father of Warmington's children and the robbery is tenuous. There is no indication that the man lived with Warmington, kept belongings at her home, or had any concrete connection to the crimes charged. He was not around when the crimes occurred. Birl, Davis, and Lewis may have been looking for guns and money they believed were kept at the house, but that is not relevant to Rosebud's account of having the robbery suddenly suggested to him and refusing to participate until he felt he was forced to. The court did not err by excluding these portions of the interview.

Finally, the district court excluded statements that Rosebud contends were relevant to his compulsion defense because it found that such a defense was not supported by the content of the interview:

- Rosebud was not given a choice and Birl had said, "you [*sic*] either with me or against me," which Rosebud perceived as a threat; and
- Rosebud was scared of Birl, and Davis knew where Rosebud lived, so he was scared that he would end up dead or his family would be in danger.

13

Considering the pretrial stage of these decisions, the district court did not err by excluding these statements. The jury was instructed that under a compulsion defense, Rosebud would not be criminally liable if he "acted under the compulsion or threat of imminent infliction of death or great bodily harm, and he reasonably believed that death or great bodily harm would be inflicted upon him if he did not act as he did." See K.S.A. 2020 Supp. 21-5206(a). Birl's vague statement does not support such a defense. Nor does Rosebud's fear of future harm to himself or his family—the threat of death or great bodily harm must be imminent—and Birl got out of the car right after making his statement. So the court did not err by excluding these statements at that time, because they were not relevant to an issue at trial.

After working through the redactions, the district court emphasized that it was analyzing this from a pretrial lens. The court said that the State had the right to introduce this interview and the relevant question was what the State must constitutionally present along with the inculpatory statements it would include. The court said that it could revisit the compulsion issue if Rosebud decided to testify. Defense counsel renewed the objections he made during the redaction hearing during the State's case-in-chief, but he did not raise the issue again once Rosebud decided to testify.

Ultimately, Rosebud *did* testify, and he spoke extensively about how he felt compelled by Birl to participate in the crime. Rosebud testified that Birl told him, "you [*sic*] either with me or against me," he never had a chance to leave once he gave the keys to Davis, Birl talked about killing kids with no emotions, and he felt like Birl would have shot him if he did not join in.

So Rosebud *introduced* into evidence the statements that he now complains were excluded. It is just that those statements were excluded at the pretrial stage, when it was unclear whether Rosebud would testify, and the State would have a chance to cross-examine him on the statements. There is no reversible error here.

14

*The verdict form was proper.*

Over Rosebud's objection, the court submitted to the jury a verdict form that first listed "guilty" and then "not guilty" on the following line. Rosebud argues that by placing the option of guilty before the option of not guilty, the verdict form undermined the presumption of innocence under the Fourteenth Amendment to the United States Constitution and violated his fundamental right to a fair trial.

The Kansas Supreme Court most recently rejected this argument in *State v. Fraire*, 312 Kan. 786, 795-97, 481 P.3d 129 (2021). We are bound by that holding. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). This is not reversible error.

*The court erred when it failed to instruct the jury to begin its deliberations from the start once an alternate juror was placed on the jury.*

The law is clear on this point. A defendant has the right to a verdict reached only after full participation of all the jurors who ultimately return the verdict. Thus, if an alternate juror is substituted after deliberations have begun, the jury must be instructed to begin deliberations anew. *State v. Haislip,* 237 Kan. 461, Syl. ¶ 1, 701 P.2d 909 (1985). The State concedes the error here. But is it a reason to reverse the convictions?

Both parties agree we must review for clear error because Rosebud did not ask the court to instruct the jury on the issue. Under that standard, this court will reverse only if it is firmly convinced that the jury would have reached a different verdict if the error had not occurred. The burden to convince this court is on Rosebud because he is the party claiming error. *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

Rosebud contends that he has shown clear error given the mixed verdict and the "questionable case" against him. We recognize that the jury was deadlocked on

15

Rosebud's charges for aggravated robbery and aggravated burglary. But as the State notes, whatever the jury's reasoning for its verdict, the evidence at trial supports the charges on which the jury reached a verdict, which were conspiracy to commit both burglary and robbery, burglary of a vehicle, and three counts of aggravated child endangerment. And as already detailed, the case against Rosebud was hardly "questionable."

We note that most of the jury's deliberations occurred with the alternate juror. The jury deliberated for about two hours on Friday afternoon; the alternate juror was then placed on the jury after a juror told the court that she would be unable to return Monday morning. Then on Monday, the jury deliberated for about six hours before reaching a verdict on six of the charges.

Under these circumstances, we are not firmly convinced that the verdict would have been different had the district court instructed the jury to restart deliberations when the alternate juror joined. We will not reverse because of this error.

*The claim of cumulative error is unpersuasive.*

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when all of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. *State v. Hirsh*, 310 Kan. 321, 345-46, 446 P.3d 472 (2019).

We recognize that the State's question to Rosebud about falsifying documents was harmless error. And the procedural error on the failure to instruct the jury to start anew

16

was also harmless. The two errors here were independent of each other. The jury error seems especially harmless—the alternate juror was with the jury for three-fourths of the deliberation time, so there is no reason to think that the juror did not fully participate. And as discussed above, although the jury doubted some of the State's case, the evidence against Rosebud was strong. Given the circumstances here, we are unconvinced that Rosebud was substantially prejudiced by these mistakes to the extent that when the errors are combined he was denied a fair trial.

Affirmed.